Francis J. "Casey" Flynn, Jr., #304712
**LAW OFFICE OF FRANCIS J. FLYNN, JR.**
6057 Metropolitan Plz.
Los Angeles, CA 90036
Tel: (314) 662-2836
casey@lawofficeflynn.com

(Additional Counsel on Signature Page)

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **JOHN CARNEY**, derivatively on behalf of **THE ENSIGN GROUP, INC.**,<br><br>Plaintiffs,<br><br>v.<br><br>**BARRY PORT, DR. ANN SCOTT BLOUIN, BARRY M. SMITH, DAREN SHAW, DR. JOHN AGWUNOBI, MARK PARKINSON, SWATI ABBOTT, SUZANNE D. SNAPPER, and MARIVIC UYCHIAT PISON**<br><br>Defendants,<br><br>-and-<br><br>**THE ENSIGN GROUP, INC.**, a Delaware Corporation,<br><br>Nominal Defendant. | Case No. 2:26-cv-13490<br><br>**PLAINTIFF'S VERIFIED DERIVATIVE COMPLAINT FOR DAMAGES FOR:**<br><br>**(1) BREACH OF FIDUCIARY DUTY (Derivatively Against the Director Defendants);**<br>**(2) BREACH OF FIDUCIARY DUTY (Derivatively Against the Office Defendants)**<br>**(3) GROSS MISMANAGEMENT (Against All Defendants)**<br>**(4) WASTE OF CORPORATE ASSETS (Derivatively Against All Defendants)**<br>**(5) UNJUST ENRICHMENT (Derivatively Against the Officer Defendants)**<br>**(6) VIOLATION OF SECTION 14(A) OF THE EXCHANGE ACT (Against the Director Defendants)**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff John Carney ("Plaintiff"), derivatively on behalf of The Ensign

Group, Inc. ("Ensign" or the "Company"), brings the following complaint against the Company's board of directors (the "Board") and executive officers for breaches of fiduciary duties, gross mismanagement, waste of corporate assets, unjust enrichment, and violation of Section 14(a) of the Securities Exchange Act of 1934. Except for allegations specifically pertaining to Plaintiff and Plaintiff's own acts, the allegations in the Complaint are based upon information and belief, which include but are not limited to: (i) the Company's public filings with the United States Securities and Exchange Commission (the "SEC"); (ii) pleadings filed in *Perusek v. The Ensign Group, Inc.*, 26-cv-2963 (C.D. Cal.) (the "Securities Class Action"); (iii) corporate governance documents available on the Company's website; (iv) media reports; and (v) other publicly available information.

## JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a)(1), and Rule 14a-9 promulgated thereunder, 17 C.F.R. § 240.14a-9.

2. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

3. Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

4. Venue is proper in this court under 28 U.S.C. § 1391, because Ensign is headquartered in this District, and a significant amount of the conduct at issue took place and had an effect in this District.

## NATURE OF THE ACTION

5. This is a stockholder derivative action brought by Plaintiff, a stockholder of Ensign, on behalf of the Company against the Defendants. This action alleges breaches of fiduciary duty by the Board and senior executive officers occurring from at least February 10, 2022, to June 18, 2026 (the "Relevant Time Period"). During that time the Defendants (as defined herein) caused or allowed Ensign to issue or make materially false and misleading statements concerning the Company's financial condition and business operations.

6. Ensign describes itself as the parent company of the "Ensign group of companies, which invest in and provide skilled nursing and senior living services, physical, occupational and speech therapies, other rehabilitative and healthcare services, and real estate[.]"

7. During the Relevant Time Period, the Company made false and misleading statements regarding its businesses and financial performance, which statements were false and misleading because they omitted that Ensign: (a) neglects elderly patients to generate profits; (b) regularly engages in illegal activities such as upcoding; (c) defrauds the federal government by, among other means, taking funds to care for especially unwell patients, but then not caring for those same patients; and (d) takes measures to conceal the foregoing that include manipulating ratings on its facilities.

8. On June 8, 2026, Hunterbrook Media, an investment focused media reporting outlet, published a report entitled "Ensign: The Nursing Home Empire Built on Fatal Neglect". Following release of this report, the price of Ensign's stock fell $13.88 per share, or 8.15%, to close at $156.42 per share on June 8, 2026. On June 11, 2026, Muddy Waters Research published a report entitled "Ensign: Deceiving the Government at Estimated 20% of Facilities". On this news, Ensign stock fell $4.52 per share, or 2.98%, to close at $147.13 on June 11, 2026. Then, on

June 18, 2026, Hunterbrook Media issued a follow-up report entitled "New: Patients Hungry in Ensign Facilities". Following publication of this report, Ensign stock fell $2.19 per share, or 1.4%, to close at $153.65 per share on June 18, 2026.

9. Through this action, Plaintiff seeks to hold the Board and executive officers accountable for making or causing the Company to make false and misleading statements, for issuing false and misleading proxy statements as well as for the inadequate internal controls that allowed the misconduct to occur, in breach of their fiduciary duties to the Company.

## PARTIES

### a. Plaintiff

10. Plaintiff John Carney is a current shareholder of Ensign and has continuously held Ensign stock during all times relevant hereto and is committed to retaining Ensign shares through the pendency of this action to preserve his standing. Plaintiff will adequately and fairly represent the interests of Ensign and its shareholders in enforcing its rights.

### b. Nominal Defendant

11. Nominal Defendant Ensign is a corporation organized and existing under the laws of the State of Delaware. The Company's principal executive offices are located at 29222 Rancho Viejo Road, Suite 127, San Juan Capistrano, CA 92675. Ensign common stock trades on the NASDAQ exchange under the ticker symbol "ENSG."

### c. Individual Defendants

12. Defendant Barry Port has served as CEO and director of the Company since May, 2019 and was appointed Chairman of the Board in September 2025.

13. Defendant Dr. Ann Scott Blouin has been a director of the Company since 2018.

14. Defendant Barry M. Smith has been a director of the Company since

2014.

15. Defendant Daren Shaw has been a director of the Company since 2012.

16. Defendant Dr. John Agwunobi has been a director of the Company since 2023.

17. Defendant Mark Parkinson has been a director of the Company since 2024.

18. Defendant Swati Abbott has been a director of the Company since 2020.

19. Defendant Suzanne D. Snapper has been a director of the Company since 2022 and has been CFO since August 2009.

20. Defendant Marivic Uychiat Pison has been a director of the Company since 2025.

21. Defendants Port, Blouin, Smith, Shaw, Agwunobi, Parkinson, Abbott, Snapper, and Pison are herein referred to as "Director Defendants."

22. Defendants Port and Snapper are sometimes herein referred to as "Officer Defendants."

## FURTHER SUBSTANTIVE ALLEGATIONS

**Company Background**

23. Ensign is a holding company founded in 1999 with independent subsidiaries that provide skilled nursing, senior living and rehabilitative services, as well as other ancillary businesses (including mobile diagnostics and medical transportation) in 17 states. As part of its investment strategy, Ensign also acquires, leases and owns healthcare real estate to serve the post-acute care continuum through acquisition and investment opportunities in healthcare properties.

**d. Ensign's False and Misleading Statements**

24. From at least February 10, 2022, through June 18, 2026, Ensign and its executive officers made materially false and misleading statements about the

Company's business and financial performance.

25. On February 9, 2022, Ensign filed with the SEC its Annual Report on Form 10-K for the year ended December 31, 2021 (the "2021 Annual Report"). Attached to the 2021 Annual Report were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Port and Snapper attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

26. The 2021 Annual Report contained, in pertinent part, the following risk disclosure under the heading "We are subject to various government reviews, audits and investigations that could adversely affect our business, including an obligation to refund amounts previously paid to us, potential criminal charges, the imposition of fines, and/or the loss of our right to participate in Medicare and Medicaid programs":

> *As a result of our participation in the Medicaid and Medicare programs, we are subject to various governmental reviews, audits and investigations to verify our compliance with these programs and applicable laws and regulations. We are subject to regulatory reviews relating to Medicare services, billings and potential overpayments* resulting from Recovery Audit Contractors, Zone Program Integrity Contractors, Program Safeguard Contractors, Unified Program Integrity Contractors, Supplemental Medical Review Contractors and Medicaid Integrity Contractors programs (collectively referred to as Reviews), in which third party firms engaged by CMS conduct extensive reviews of claims data and medical and other records to identify potential improper payments under the Medicare programs. Private pay sources also reserve the right to conduct audits. We believe

that billing and reimbursement errors and disagreements are common in our industry. We are regularly engaged in reviews, audits and appeals of our claims for reimbursement due to the subjectivities inherent in the process related to patient diagnosis and care, record keeping, claims processing and other aspects of the patient service and reimbursement processes, and the errors and disagreements those subjectivities can produce.

An adverse review, audit or investigation could result in:

- an obligation to refund amounts previously paid to us pursuant to the Medicare or Medicaid programs or from private payors, in amounts that could be material to our business;
- state or federal agencies imposing fines, penalties and other sanctions on us;
- temporary or permanent loss of our right to participate in the Medicare or Medicaid programs or one or more private payor networks;
- an increase in private litigation against us; and
- damage to our reputation in various markets.

* * *

*Additionally, both federal and state government agencies have heightened and coordinated civil and criminal enforcement efforts as part of numerous ongoing investigations of healthcare companies and, in particular, skilled nursing facilities. The focus of these investigations includes, among other things:*

- cost reporting and billing practices;
- quality of care;
- financial relationships with referral sources; and

> • medical necessity of services provided.
>
> If the government or court were to conclude that errors and deficiencies constitute criminal violations, concluded that such errors and deficiencies resulted in the submission of false claims to federal healthcare programs, or if it were to discover other problems in addition to the ones identified by the probe reviews that rose to actionable levels, we and certain of our officers might face potential criminal charges and civil claims, administrative sanctions and penalties for amounts that could be material to our business, results of operations and financial condition. In addition, we or some of the key personnel of our operating subsidiaries could be temporarily or permanently excluded from future participation in state and federal healthcare reimbursement programs such as Medicaid and Medicare.

27. The statement in ¶ 26 was materially false and misleading at the time it was made because it omitted that Ensign (a) neglects elderly patients to generate profits; (b) regularly engages in illegal activities such as upcoding; (c) defrauds the federal government by, among other means, taking funds to care for especially unwell patients, but then not caring for those same patients; and (d) takes measures to conceal the foregoing that include manipulating ratings on its facilities.

28. The 2021 Annual Report contained the following risk disclosure under the heading "[w]e are subject to extensive and complex laws and government regulations. If we are not operating in compliance with these laws and regulations or if these laws and regulations change, we could be required to make significant expenditures or change our operations in order to bring our facilities and operations into compliance", stating in pertinent part, the following:

> We, along with other companies in the healthcare industry, are required to comply with extensive and complex laws and regulations at the

federal, state and local government levels relating to, among other things:

- licensure and certification;
- adequacy and quality of healthcare services;
- qualifications and vaccination of healthcare and support person***al;***
- quality of medical equipment;
- confidentiality, maintenance and security issues associated with medical records and claims processing;
- relationships with physicians and other referral sources and recipients;
- constraints on protective contractual provisions with patients and third-party payors;
- operating policies and procedures;
- addition of facilities and services; and
- billing for services.

The laws and regulations governing our operations, along with the terms of participation in various government programs, regulate how we do business, the services we offer, and our interactions with patients and other healthcare providers. These laws and regulations are subject to frequent change. We believe that such regulations may increase in the future, and we cannot predict the ultimate content, timing or impact on us of any healthcare reform legislation. Changes in existing laws or regulations, or the enactment of new laws or regulations, could negatively impact our business. If we fail to comply with these applicable laws and regulations, we could suffer civil or criminal penalties and other detrimental consequences, including denial of

reimbursement, imposition of fines, temporary suspension of admission of new patients, suspension or decertification from the Medicaid and Medicare programs, restrictions on our ability to acquire new facilities or expand or operate existing facilities, the loss of our licenses to operate and the loss of our ability to participate in federal and state reimbursement programs. Additionally, in the future, different interpretations or enforcement of these laws and regulations could subject our current or past practices to allegations of impropriety or illegality or could require us to make changes in our facilities, equipment, personnel, services, capital expenditure programs and operating expenses.

As discussed in greater detail in Item 1., under Government Regulation, we are subject to federal and state laws intended to prevent healthcare fraud and abuse, including the federal FCA, state false claims acts, the illegal remuneration provisions of the Social Security Act, the Anti-Kickback Statute, state anti-kickback laws, the Civil Monetary Penalties Law and the federal "Stark" Law. Among other things, these laws prohibit kickbacks, bribes and rebates, as well as other direct and indirect payments or fee-splitting arrangements that are designed to induce the referral of patients to a particular provider for medical products or services payable by any federal healthcare program and prohibit presenting a false or misleading claim for payment under a federal or state program. They also prohibit some physician self-referrals. Possible sanctions for violation of any of these restrictions or prohibitions include loss of eligibility to participate in federal and state reimbursement programs and civil and criminal penalties. If we fail to comply, even inadvertently, with any of these requirements, we could

be required to alter our operations, refund payments to the government, enter into a corporate integrity agreement, deferred prosecution or similar agreements with state or federal government agencies, and become subject to significant civil and criminal penalties.

These anti-fraud and abuse laws and regulations are complex, and we do not always have the benefit of significant regulatory or judicial interpretation of these laws and regulations. While we do not believe we are in violation of these prohibitions, we cannot assure you that governmental officials charged with the responsibility for enforcing these prohibitions will not assert that we are violating the provisions of such laws and regulations. Our company is currently aware of another investigation by the DOJ related to allegations some of our California facilities may have violated the FCA or the Anti-Kickback Statute with respect to the relationships between certain of our skilled nursing facilities and persons who served as medical directors, advisory board participants or other referral sources. While our operating entities maintain policies and procedures to promote compliance with the FCA, the Anti-Kickback Statute, and other applicable regulatory requirements, we cannot predict when the investigation will be resolved, the outcome of the investigation or its potential impact on our company.

29. The statement in ¶ 28 was materially false and misleading at the time it was made because it omitted that Ensign (a) neglects elderly patients to generate profits; (b) regularly engages in illegal activities such as upcoding; (c) defrauds the federal government by, among other means, taking funds to care for especially unwell patients, but then not caring for those same patients; and (d) takes measures to conceal the foregoing that include manipulating ratings on its facilities.

30. The 2021 Annual Report contained a risk disclosure under the heading "Public and government calls for increased survey and enforcement efforts toward long-term care facilities could result in increased scrutiny by state and federal survey agencies. In addition, potential sanctions and remedies based upon alleged regulatory deficiencies could negatively affect our financial condition and results of operations", stating in pertinent part, the following:

> As CMS turns its attention to enhancing enforcement of long-term care facilities, as discussed in Item 1., under Government Regulation, state survey agencies will have more accountability for their survey and enforcement efforts. As discussed in Item 1., under Government Regulation, from time to time in the ordinary course of business, we receive deficiency reports from state and federal regulatory bodies resulting from such inspections or surveys. The focus of these deficiency reports tends to vary from year to year and state to state. Although most inspection deficiencies are resolved through an agreed-upon plan of corrective action, the reviewing agency typically has the authority to take further action against a licensed or certified facility, which could result in the imposition of fines, imposition of a license to a conditional or provisional status, suspension or revocation of a license, suspension or denial of payment for new admissions, loss of certification as a provider under state or federal healthcare programs, or imposition of other sanctions, including criminal penalties. In the past, we have experienced inspection deficiencies that have resulted in the imposition of a provisional license and could experience these results in the future.
>
> Furthermore, in some states, citations in one company facility could negatively impact other company facilities in the same state.

Revocation of a license at a given facility could therefore impair our ability to obtain new licenses or to renew existing licenses at other facilities, which may also trigger defaults or cross-defaults under our leases and our credit arrangements, or adversely affect our ability to operate or obtain financing in the future. If state or federal regulators were to determine, formally or otherwise, that one facility's regulatory history ought to impact another of our existing or prospective facilities, this could also increase costs, result in increased scrutiny by state and federal survey agencies, and even impact our expansion plans. Therefore, our failure to comply with applicable legal and regulatory requirements in any single facility could negatively impact our financial condition and overall of operations results.

From time to time, we have opted to voluntarily stop accepting new patients pending completion of a new state survey, in order to avoid possible denial of payment for new admissions during the deficiency cure period, or simply to avoid straining staff and other resources while retraining staff, upgrading operating systems or making other operational improvements. If we elect to voluntary close any operations in the future or to opt to stop accepting new patients pending completion of a state or federal survey, it could negatively impact our financial condition and results of operation.

We have received notices of potential sanctions and remedies based upon alleged regulatory deficiencies from time to time, and such sanctions have been imposed on some of our affiliated facilities. We have had affiliated facilities placed on special focus facility status in the past, continue to have some facilities on this status currently and other operating subsidiaries may be identified for such status in the future.

We currently have one facility placed on special focus facility status.

31. The statement in ¶ 30 was materially false and misleading at the time it was made because it materially understated the risk of various penalties considering that Ensign (a) routinely neglects vulnerable people living in its facilities; (b) defrauds government programs such as Medicaid and Medicare by taking funds intended to assist individuals with serious health challenges, and then neglecting them; (c) covers up the foregoing by, among other means, materially overstating the number of hours that nurses and other professionals are at its facilities and manipulating ratings on its facilities; and (d) engages in rampant illegal upcoding.

32. The 2021 Annual Report contained a risk disclosure under the heading *"If we do not achieve or maintain competitive quality of care ratings from CMS or private organizations engaged in similar monitoring activities, our business may be negatively affected"***,** stating in pertinent part the following:

> CMS, as well as certain private organizations engaged in similar monitoring activities, provides comparative public data, rating every skilled nursing facility operating in each state based upon quality-of-care indicators. *CMS's system is the Five-Star Quality Rating System,* introduced in 2008, to help consumers, their families and caregivers compare nursing homes more easily. *The Five-Star Quality Rating System gives each nursing home a rating of between one and five stars in various categories, and the ratings are available on a consumer-facing website, Nursing Home Compare.* In cases of acquisitions, the previous operator's clinical ratings are included in our overall Five-Star Quality Rating. Over the years, the Five-Star Quality Rating System has been modified, with the most recent changes being implemented in 2018 and 2019. Additionally, as a result of the COVID-19 pandemic and CMS' s suspension or modification of certain inspection and

reporting requirements, the data used to calculate the star ratings of facilities was interrupted. CMS temporarily froze certain data on the Nursing Home Compare website through January 2021, and recalculated its Five Star Quality ratings with modified data used to calculate the nursing home's rating. Other data related to quality reporting measures, including new or worsened pressure-related injuries and discharges to home, are not presently factored into CMS's star calculations. This data is reflected on the Nursing Home Compare website based on the recalculation in January of 2022. The temporary adjustments due to COVID-19 could impact facilities that might have less favorable Five-Star Ratings from being able to demonstrate improvements on the public-facing website through mid-2022. For more information on these changes, see Item 1., under *Government Regulation*.

33. The statement in ¶ 32 was materially false and misleading because it omitted that Ensign relies on self-reporting to have a higher quality of care ratings than would otherwise be realistic, considering that Ensign routinely neglects the elderly people in its care.

34. On February 2, 2023, Ensign filed with the SEC its Annual Report on Form 10-K for the year ended December 31, 2022 (the "2022 Annual Report"). Attached to the 2022 Annual Report were signed certifications pursuant to SOX signed by Defendants Port and Snapper attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

35. The 2022 Annual Report contained a risk disclosure under the heading "We are subject to various government reviews, audits and investigations that could adversely affect our business, including an obligation to refund amounts previously

paid to us, potential criminal charges, the imposition of fines, and/or the loss of our right to participate in Medicare and Medicaid programs." This risk disclosure was materially similar to the risk disclosure described in ¶ 26, but notably added the following language compared to the prior year's corresponding risk disclosure:

> On June 29, 2022, CMS announced updated guidance for Phase 2 and 3 of the requirements of participation. *The guidance updates the following topics: (1) resident abuse and neglect (including reporting of abuse);* (2) admission, transfer and discharge; (3) mental health and substance abuse disorders; ( 4) *nurse staffing and reporting of payroll to evaluate staffing sufficiency;* (5) residents' rights (including visitation); (6) potential inaccurate diagnoses or assessments; (7) prescription and use of pharmaceuticals, including psychotropics and drugs that act like psychotropics; (8) infection prevention and control; (9) arbitration of disputes between facilities and residents; (10) psychosocial outcomes and related severity; and (11) the timeliness and completion of state investigations to improve consistency in the application of standards among various states. The application of CMS's new guidance could result in more aggressive and stringent surveys, and potential fines, penalties, sanctions, or administrative actions taken against our independent operating subsidiaries.

36. The risk disclosure was materially false and misleading for the reasons stated in ¶ 27, and Ensign continued to materially understate the risks presented by the updated CMS guidance discussed above, considering its sweeping misconduct.

37. The 2022 Annual Report contained a substantially similar risk disclosure to the one noted in ¶ 28**.** As such, it was materially false and misleading for the reasons stated in ¶ 29.

38. The 2022 Annual Report contained a substantially similar risk

disclosure to the one noted in ¶ 30**.** As such, it was materially false and misleading for the reasons stated in ¶ 31.

39. The 2022 Annual Report contained a similar risk disclosure to the one noted in ¶ 32, stating the following under the heading *"If we do not achieve or maintain competitive quality of care ratings from CMS or private organizations engaged in similar monitoring activities, our business may be negatively affected":*

> As discussed in Item 1., under *Government Regulation,* CMS, as well as certain private organizations engaged in similar monitoring activities, provides comparative public data, rating every SNF operating in each state based upon quality-of-care indicators. *CMS's system is the Five-Star Quality Rating System, intended to compare nursing homes more easily.*
>
> *The Five-Star Quality Rating System gives each nursing home a rating of between one and five stars in various categories, with five-star ratings harder to obtain over time.* The ratings are available on a consumer-facing website, Nursing Home Compare. In cases of acquisitions, the previous operator's clinical ratings are included in our overall Five-Star Quality Rating. Based on CMS guidance issued in June of 2022, it is expected that more data will be collected by CMS and ultimately reported on the Nursing Home Compare website. Similarly, due to CMS's June 2022 guidance, we expect CMS will seek to make the data reported on the Nursing Home Compare website more readily accessible and understandable for consumers.
>
> CMS continues to increase quality measure thresholds, making it more difficult to achieve upward and five-star ratings. Most recently, CMS increased its quality measure thresholds in October of 2022, making it more difficult for facilities to obtain or maintain four- and five-star

ratings. CMS has indicated that it will increase these quality measure thresholds every six months. CMS acknowledges that some facilities may see a decline in their overall five-star rating absent any new inspection information. This is relevant to our business because the five-star ratings of our affiliated facilities may decline even as their quality measures remain unchanged, or even if their quality measures improve. This change could further affect star ratings across the industry. Additionally, on the Nursing Home Compare website, CMS recently began displaying a consumer alert icon next to nursing homes that have been cited on inspection reports for incidents of abuse, neglect, or exploitation. In July of 2022, CMS updated the scoring measures used for SNFs to include six dimensions of staffing and turnover, which may affect the rating of our facilities on the Nursing Home Compare website. CMS's expanded evaluation and measurement of staffing and turnover, including measures of all nurses, registered nurses, and administrators, may adversely affect the scoring and evaluation of our facilities under CMS's Five-Star Quality Rating System. See Item 1., under *Government Regulation.*

*Providing quality patient care is the cornerstone of our business. We believe that hospitals, physicians and other referral sources refer patients to us in large part because of our reputation for delivering quality care. If we should fail to achieve our internal rating goals or fail to exceed the national average rating on the Five-Star Quality Rating System, including due to nursing and administrative staffing and turnover, or have facilities displaying a consumer alert icon for incidents of abuse, neglect, or exploitation, it may affect our ability to generate referrals, which could have a material adverse effect upon our*

*business and consolidated financial condition, results of operations and cash flows.*

40. The statement in ¶ 39 was materially false and misleading for the reasons stated in ¶ 33. Further, stating that providing "quality patient care is the cornerstone of our business" was materially false and misleading when it was made because, in reality, Ensign's business model depends on the systematic neglect of those under its care. Further, Ensign takes various steps to cover up its misconduct.

41. On February 1, 2024, Ensign filed with the SEC its Annual Report on Form 10-K for the year ended December 31, 2023 (the "2023 Annual Report"). Attached to the 2023 Annual Report were signed certifications pursuant to SOX signed by Defendants Port and Snapper attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

42. The 2023 Annual Report contained a substantially similar risk disclosure to the one noted in ¶ 35 (which in turn had been updated from the risk disclosure contained in ¶ 26). As such, it was materially false and misleading for the reasons stated in ¶ 36.

43. The 2023 Annual Report contained a substantially similar risk disclosure to the one noted in ¶ 28**.** As such, it was materially false and misleading for the reasons stated in ¶ 29.

44. The 2023 Annual Report contained a substantially similar risk disclosure to the one noted in ¶ 30. As such, it was materially false and misleading for the reasons stated in ¶ 31.

45. The 2023 Annual Report contained a similar risk disclosure to the one noted in ¶ 39. As such, it was materially false and misleading for the reasons stated in ¶ 40.

46. On February 5, 2025, Ensign filed with the SEC its Annual Report on

Form 10-K for the year ended December 31, 2024 (the "2024 Annual Report"). Attached to the 2024 Annual Report were signed certifications pursuant to SOX signed by Defendants Port and Snapper attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

47. The 2024 Annual Report contained a substantially similar risk disclosure to the one noted in ¶ 35 (which in turn had been updated from the risk disclosure contained in ¶ 26). As such, it was materially false and misleading for the reasons stated in ¶ 36.

48. The 2024 Annual Report contained a substantially similar risk disclosure to the one noted in ¶ 30. As such, it was materially false and misleading for the reasons stated in ¶ 31.

49. The 2024 Annual Report contained a similar risk disclosure to the one noted in ¶ 39. As such, it was materially false and misleading for the reasons stated in ¶ 40.

50. On February 4, 2026, Ensign filed with the SEC its Annual Report on Form 10-K for the year ended December 31, 2025 (the "2025 Annual Report"). Attached to the 2025 Annual Report were signed certifications pursuant to SOX signed by Defendants Port and Snapper attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

51. The 2025 Annual Report contained a substantially similar risk disclosure to the one noted in ¶ 35 (which in turn had been updated from the risk disclosure contained in ¶ 26). As such, it was materially false and misleading for the reasons stated in ¶ 36.

52. The 2025 Annual Report contained a substantially similar risk disclosure to the one noted in ¶ 30. As such, it was materially false and misleading

for the reasons stated in ¶ 31.

53. The 2025 Annual Report contained a similar risk disclosure to the one noted in ¶ 39. As such, it was materially false and misleading for the reasons stated in ¶ 40.

54. On April 30, 2026, Ensign issued a press release entitled "The Ensign Group Reports First Quarter 2026 Results; Raises 2026 Annual Earnings and Revenue Guidance." The press release quoted Defendant Port as stating the following:

> *Our local leaders and their teams continue to be examples of excellence in healthcare services as they earn the trust of patients, families, and their local healthcare communities through high-quality clinical outcomes.* As each operation solidifies its reputation in its respective market, they are not only seeing more patients, *but they are also being entrusted to care for increasingly complex cases, including a larger share of Medicare, managed care, and other skilled patients.* As we've said many times, our consistent financial performance *is a direct reflection of a relentless, patient-focused culture-one that empowers our frontline teams to deliver exceptional care in a family-like environment where people genuinely care about one another[.]*
>
> Our clinical leaders also continue to drive outstanding outcomes, which is particularly impressive given our growth over the past several years. According to the most recently published CMS data, same-store Ensign-affiliated facilities outperformed their peers in annual survey results by 22% at the state level and 31 % at the county level. This is especially notable given that many of these facilities were 1- and 2-star buildings at acquisition. *Additionally, our same-store operations outperformed industry peers in 5-Star Quality Measure results by 24%*

*nationally and 20% at the state level.* These results reinforce our position as the provider of choice in our markets and demonstrate our ability to create long-term value through sustained clinical excellence[.]"

55. The statements made by Defendant Port in ¶ 54 were materially false and misleading at the time they were made because, as Defendant Port knew or should have known, Ensign's business model depends on the systematic abuse of patients through neglect, including by not providing sufficient food or toiletries. Further, Ensign seeks to become more profitable by reducing the number of skilled employees caring for the patients under its care, which it conceals. Further, Ensign manipulates the 5-Star quality measure results that Defendant Port discussed to make its facilities appear better than they are, which Defendant Port omitted, further rendering his statement materially false and misleading when made. In addition, Defendant Port discussed payments made by Medicare to Ensign but omitted that Ensign takes money from Medicare for especially unhealthy patients, but then does not use the funds to take care of those same patients.

56. The statements contained in ¶¶ 26, 28, 30, 32, 35, 39 and 54 were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Ensign's business model depends on the systematic and widespread neglect of elderly people who live in its facilities, including those with needs for high levels of care; (2) Ensign's abuse and neglect includes not giving residents enough food, medical attention, or even basic toiletries as well as failing to respond to residents in clear distress, which has resulted in resident deaths; (3) Ensign uses self-reporting measures as a way to cover up that it systematically neglects patients;

(4) Ensign defrauds Medicaid and Medicare by taking federal funds to help patients who need high levels of care, and then neglecting those same patients; (5) Ensign falsifies the number of hours that Certified Nursing Assistants spend with residents; (6) Ensign engages in an illegal scheme to rent the licenses of Administrators who are not generally present at, nor actually managing, its facilities; (7) Ensign materially understated the reputational and litigation exposure that comes with a dangerous, abhorrent, and illegal business model; and (8) as a result, Defendants' statements about its business, operations, and prospects, were materially false and misleading and/or lacked a reasonable basis at all relevant times.

57. The foregoing statements were materially false and misleading, and failed to disclose materially adverse facts about the Company's business and operations. Specifically, the statements failed to disclose that Ensign (a) neglects elderly patients to generate profits; (b) regularly engages in illegal activities such as upcoding; (c) defrauds the federal government by, among other means, taking funds to care for especially unwell patients, but then not caring for those same patients; and (d) takes measures to conceal the foregoing that include manipulating ratings on its facilities.

**e. The Truth is Revealed**

58. On June 8, 2026, at 10:30 AM EST, Hunterbrook Media ("Hunterbrook") published a report entitled "Ensign: The Nursing Home Empire Built on Fatal Neglect" (the "Hunterbrook Report").

59. The Hunterbrook Report stated that, according to Hunterbrook's Five-Month Investigation, "Ensign's business model relies on delivering inadequate care to patients while gaming data on quality[.] *Patients are dying.*"

60. The Hunterbrook Report noted the following about nursing homes:

> Most of us will require institutional care in our lifetime. We hope that care will be high quality.

> Faced with an aging population and widespread nursing shortages, every American nursing facility must contend with infections, falls, and sometimes death. On an average day, a facility might smell like human waste cut with cleaning products. Easy listening music covers the croaking sounds of uncomfortable residents. Frontline staff do their best at difficult and lowpaying jobs, in facilities lit fluorescently and decorated in liminal beige.
>
> *But Ensign has established something worse: a business model that seems to depend on eroding care for America's sick and elderly.*

61. The Hunterbrook Report stated that Hunterbrook's investigation showed that Ensign *"boomed in recent years by rolling up distressed homes, cutting high-skilled nursing staff, and gaming metrics."*

62. The Hunterbrook Report stated the following about Ensign's expansion in recent years:

> Our investigation shows the company boomed in recent years by rolling up distressed homes, cutting high-skilled nursing staff, and gaming metrics.
>
> * * *
>
> Ensign operates the most CMS-certified nursing facilities in America, with 334 locations across 17 states. They offer more than 38,000 skilled nursing beds[.] *But these facilities have problems - and they seem to get worse after Ensign takes over. Conditions at several of its facilities are so severe that they are candidates on CMS's "Special Focus Facility" list,* a roundup of facilities with a pattern of serious problems that pose risks to resident health and safety. *Facilities on the SFF list are at risk of being terminated from Medicare or Medicaid programs.*

* * *

*Ensign's model is working. It grew rapidly after its current CEO took the helm in 2019.* His $13.8 million in compensation last year - at a company whose revenue is largely derived from public funds - was mostly tied to company performance.

63. The Hunterbrook Report further stated the following about how Ensign cuts support upon acquiring a nursing home facility:

*We used 72 months of CMS [Centers for Medicaid & Medicaid Services, or "CMS"] Provider Information records spanning January 2020 to March 2026 and tracked 161 facilities before and after Ensign acquired them, verified by CMS Change of Ownership records.*

We then compared the changes at Ensign facilities to what was happening nationally at roughly 15,000 other facilities over the same time periods, using a technique called difference-in-differences that helps sift the Ensign Effect from broader industry trends.

The result? After Ensign takes over, total nursing hours fall at a statistically significant rate, and continue to fall over time.

*The Ensign Effect is especially visible among their higher-paid and most highly skilled employees.*

*Before acquisition, the registered nurse hours of the facilities hover around the national average. After, a steady decline sets in and widens over the following years.*

64. The Hunterbrook Report further stated: The drop in RN hours also leads to a change in the overall staffing mix.

An increased share of care hours are provided by Certified Nursing Assistants (CNAs) and Licensed Practical Nurses (LPNs), ***who are less highly trained than*** *RNs and generally cannot provide complex*

*medical assessments or treatments independently.*

And yet, while overall nursing care hours and the share of those hours being provided by the most highly skilled professionals is dropping precipitously, *somehow Ensign's overall star ratings consistently improve at facilities it acquires.*

*How can that be? Overall ratings* - featured prominently on CMS' s Care Compare site where families shop for nursing homes - are built by starting with the health inspection score and then adding up to one star each for staffing and quality measures, *including self-reported numbers. Under this methodology, self-reported data can lift a facility's overall rating by as many as two stars: a 2-star health inspection can become a 4-star overall, and a 3-star can become a 5-star.*

65. The Hunterbrook Report stated the following about how Ensign's incentive model creates a perverse incentive to cut care for those who need it most:

And Ensign does not limit incentive-based compensation to its senior executives. *Our investigation found that some individual facility administrators are compensated the same way, creating powerful incentives to cut costs. While it's normal to have financial performance incentives for cutting costs, it's different when the incentive is to cut nursing hours - the results can be a matter of life and death.*

66. The Hunterbrook Report then stated the following about how a lawsuit deposition taken in an action in Arizona state court, *Faas et al v. Sunland Health Associates,* cv2021-091416, in which Ensign is also named as a defendant, shows the following:

For example, a lawsuit deposition [in the aforementioned *Faas* action] shows *the company tied a facility administrator's bonus directly to location profits, and by staffing below recommended levels, that*

> *administrator was able to boost a roughly $400,000 annual bonus to more than $800,000.*
>
> As a result of understaffing at that very same facility, the lawsuit claims, a resident died, his final moments captured on a recorded phone call provided to Hunterbrook[.]

67. The Hunterbrook Report stated the following about Doni Hunt Webb, who lives in an Ensign facility in Utah:

> *To mask the sounds of screaming and crying, Doni Hunt Webb plays loud music.* "I know this is neglect and abuse," she said. She has lived in an Ensign facility in Utah for more than five years.
>
> "I am a broken person now," she told Hunterbrook, her voice sounding heavy. "I watch many people in here get broken." *She described the daily reality of an Ensign facility, which she said was understaffed: persistent hygiene and medical failures.*
>
> Hunt Webb said she suffers from extreme nerve damage, a condition *she said does not get adequate treatment due to persistent understaffing, turnover, and a lack of training.*
>
> *At times, staff use wet paper towels in place of toilet paper, Hunt Webb said. She and other residents get recurring infections, she said, recalling that another patient cried and screamed after going a day without food, without being changed, left in a soaking wheelchair.*
>
> "The lack of staffing is the number one thing that affects residents' quality of life," the deputy state ombudsman in Texas, Alexa Schoeman, told Hunterbrook.

68. The Report stated the following about other deaths at Ensign facilities:

> Thomas Scates died after an Ensign facility neglected him, according to his family. *Herbert Howenstein died after a large pressure ulcer*

> *developed at an Ensign nursing home. Six inches long, an inch deep, blackened dead flesh, penetrating to muscle. An EMT report shows that facility staff were aware but nobody was treating him for it.* An expert reviewing his death concluded, "The patient's demise was almost merciful." *A nonverbal resident with Alzheimer's was found covered in ants with bites all over her body - an infestation discovered by her family, not the staff, according to an investigation report.* Cheryle Weir died after begging for help that did not come in time, her daughter told Hunterbrook. These are just some of the stories Hunterbrook heard, which represent a fraction of the devastation in Ensign facilities around the country.

69. The Hunterbrook Report further stated the following about Cheryle Weir's death:

> *They beat the walls.*
>
> *Cheryle Weir couldn't breathe, her roommate recalled.* Dependent on ventilators at an Ensign facility, they couldn't talk. They couldn't scream.
>
> So they banged on the table, banged on the wall, desperate for anyone to hear. A nurse should have been there. No one was.
>
> *Eventually, Cheryle stopped banging.*

70. The Hunterbrook Report quoted Cheryle Weir's daughter as saying "[w]e *could've had so much more time. And it was taken away."*

71. The Hunterbrook Report stated the following about the consequences of using lower-skilled care:

> Staffing cuts and pushing work onto lower-skilled employees can have serious consequences, according to our sources.
>
> Dominique Haynes, a former CNA at an Ensign facility in Texas,

mentioned uncertified staff providing care.

*"I constantly saw residents passing away,"* she said, referring to the result of dialysis procedures performed by staff she thought were unqualified to do so.

*Haynes also described chronic supply shortages. Each morning, she said she went "Easter egg hunting" for scarce supplies. She hoarded wet wipes. Catheters went unchanged, and residents were regularly left sitting in urine.*

*"They're scared that they won't be changed, or that they're not going to get water, or they're not going to be taken care of," Haynes said.*

The Hunterbrook Report discussed how public money from Medicare and Medicaid flows to Ensign based on the needs of Ensign residents, but how in turn, Ensign does not use those funds to care for those residents: *Public money flows to Ensign and other skilled nursing operators based on the needs of their residents. But many simply don't staff accordingly.*

Each nursing facility funded by Medicare, Medicaid, or both is bound by federal law to have "sufficient nursing staff' to meet the needs of each resident, also referred to as patient "acuity." The higher the acuity, the more staffing the law generally demands.

And Ensign residents tend to have higher needs than most.

*That's by design, former Ensign employees told Hunterbrook.*

*"They were seeking out people with more complex needs," said one former therapist. Administrators would deliberately "find the most complex diagnosis of that patient for the highest payback."* Ensign's own financial filings indicate their patients are "often high-acuity" and that their "business model is based in part on serving higher acuity

patients." As acuity goes up, so too should hours of care, according to federal law. But Hunterbrook's analysis found no consistent relationship at Ensign.

72. The Hunterbrook Report stated the following about how Ensign's staffing cuts might work if the patient population at its facilities were healthier, but how Ensign ***specifically targets*** facilities with populations who are sicker than average to get more federal funding, at the expense of patient care:

> Ensign's staffing cuts might make sense if the overall patient population at facilities acquired by Ensign also had lower acuity over time. *But because the government pays more for higher acuity populations, Ensign actually seeks to acquire facilities where patients are sicker than the national average, Hunterbrook found.* Ensign says as much in their public communications, highlighting the sicker-than-average populations in their facilities and telling shareholders that while these struggling nursing homes might negatively affect margins at first, they typically contribute "to earnings within 12 to 18 months." *The numbers suggest Ensign accomplishes this primarily by cutting down on the staff tasked with the survival of some of the nation's sickest and most vulnerable people.*

73. That portion of the Hunterbrook Report stated the following, including how dependent Ensign's financial model is on neglecting the elderly:

> *Ensign's profits can be traced to providing less care than its patients need - and less care than it is meant to provide based on the tax dollars it receives from the government.* Government programs pay skilled nursing facilities based on "acuity level," a measurement of how sick the residents are. Ensign says it's focusing on high-acuity people in order to increase its revenue, the bulk of which comes from government

programs. *But then it staffs many facilities below the levels needed to provide the care those payment rates are calibrated to support.* Using the formula from a 2025 peer-reviewed study, *Hunterbrook calculated a 5 million-hour gap between hours of nursing care needed and hours actually provided at Ensign facilities between July and November 2024, the period for which robust data is available. "The difference between those two numbers is fraud," opined Ernest Tosh, an attorney who litigates nursing home abuse and neglect cases.* Hunterbrook estimates that closing that staffing gap *would have cost Ensign about $161 million during the period studied – or roughly $386 million annualized. That's more than the company's entire reported net income that year of $298 million.* Hunterbrook also found that the more a facility profited from understaffing, the worse its health survey scores, facility-reported incidents, complaint deficiencies, total penalties, staff turnover, and staffing ratings.

74. The Hunterbrook Report included a portion with a quote from Ed Dudensing, who the Hunterbrook Report describes as an elder-abuse attorney. Specifically, the Hunterbrook Report stated the following:

*Federal and state laws prohibit understaffing. Federal law requires every Medicare- and Medicaid-funded nursing facility to keep "sufficient nursing staff" to meet each resident's needs. The sicker the resident, the more staffing the law generally demands.* Yet Hunterbrook found no consistent relationship between how sick Ensign's residents are and how many hours it staffs. *Four states where Ensign operates impose numeric floors on the care that must be provided: California, Washington, Tennessee, and Kansas. Our analysis of CMS records from 2020 through 2025 found Ensign facilities falling below the legal floors*

*in those states on more than 18,000 days cumulatively.* “[The regulation is that you have] to staff to meet the needs of residents, and that consistently does not happen,” said Ed Dudensing, an elder-abuse attorney, describing insufficient staffing.

*“That's illegal.”*

75. The Hunterbrook Report stated the following regarding “systematic misrepresentations” made by Ensign employees: Fabricated Google reviews; document falsification; falls downgraded to “slips;” improperly upcoded patient acuity; and retaliation against staff who refused to engage in these activities. Former employees also told Hunterbrook they were compelled to provide unnecessary care and exaggerate its duration. *One former Ensign therapist described higher-ups encouraging higher billing via falsifying minutes of therapy: “The 30 would be erased and somebody would put in a 70.”*

76. The Hunterbrook Report further contained a section on how Ensign uses related party transactions to conceal how profitable it is, because if Ensign appeared more profitable, that would raise questions about why its profits are not being used to improve patient care, rather than pay for, among other things, executive compensation. The Hunterbrook Report highlighted a letter sent by Senator Elizabeth Warren to Christopher Christensen, the then Executive Chairman of Ensign's Board, highlighting as much.[1]

77. On this news, the price of Ensign stock fell $13.88 per share, or 8.15%, to close at $156.42 per share on June 8, 2026.

78. Ensign did not respond to the Hunterbrook Report. As the Hunterbrook Report noted, Ensign was asked to “respond to multiple detailed requests for comment from Hunterbrook” and did not do so. The Hunterbrook Report further

[1] https://www.warren.senate.gov/imo/media/doc/2024.05.05%20Letter%20to%20the%20Ensign%20Group.pdf

stated that "[w]hen asked directly about our findings regarding the staffing gap and failures to meet minimum staffing levels, *Ensign didn't refute them or offer additional data. The company didn't respond at all.*" The Hunterbrook Report further stated that when asked about cutting staff hours and shifts of more skilled, higher paid caregivers to "less skilled, cheaper ones," Ensign did not respond to "repeated requests." The Hunterbrook Report further stated that Ensign did not "respond to [Hunterbrook's] questions about [Ensign's] apparent manipulation of the quality rating system." Regarding the use of related party transactions to conceal profitability, as mentioned above, the Hunterbrook Report stated that "Ensign did not respond to Hunterbrook's repeated questions regarding its related party transactions."

79. Then, on June 11, 2026, Muddy Waters Research ("MW") published a report entitled "Ensign: Deceiving the Government at Estimated ~ 20% of Facilities" (the "MW Report").

80. The MW Report stated in part the following:

> *[MW] is short Ensign[.] We conclude that Ensign engages in a systematic scheme at an estimated ~20% of Skilled Nursing Facilities (SNFs) to rent the licenses of Administrators who are not generally present at, nor actually managing, the facilities.* Ensign enters into consulting agreements with these nominal Administrators that appear to cause Ensign to state the facilities have licensed Administrators when in fact these administrators are seldom on premise and do not substantively manage facilities. *We believe this scheme, which could amount to fraud against states, Medicare, and Medicaid, is the pillar upon which Ensign's acquisition strategy and margins is built. Federal law requires each SNF have a licensed Administrator (the state sets the licensing requirement) who manages the facility to meet a Condition of*

*Participation to be eligible to bill Medicare and Medicaid, which account for 69% of Ensign's revenue.* The Administrator is legally responsible for facility operations, staffing, regulatory compliance, resident safety, and quality of care. Under the False Claims Act, if these practices have been in place for one year at ~20% of facilities, we estimate the violations carry theoretical sanctions in the billions of dollars. *We estimate that without the license renting scheme and related practices, which we believe enable its acquisitions and result in unduly low expenditures, Ensign's EBITDAR margins would compress by ~210 bps and its growth would be limited to the ~2% rate of its peers.* We estimate that compliance - exclusive of any sanctions - would reduce Ensign's 2027 EBIT by ~35% vs consensus.

81. The MW Report stated the following about MW' s investigation:

*We sent investigators to 57 of Ensign's facilities across eight states.*

*We found red flags consistent with rented licenses at 12 of these facilities, which was 21% of the facilities visited.* MW has obtained a "Consulting Agreement" reportedly used to rent an Administrator's license. *Eight former employees have detailed how the scheme operates, which makes clear to us that these practices are intended to deceive regulators.* The Centers for Medicare & Medicaid Services appears unaware that ENSG is systematically engaging in this behavior, which is likely due to the numerous brands under which Ensign operates its SNFs. *In 2023 and 2024, CMS has issued reports showing unlicensed operators running four facilities that belong to Ensign, illustrating that CMS has likely not yet connected the dots.*

Hunterbrook Media on June 8th issued a report exposing low nursing levels, dangerous practices, and overbilling for therapy at Ensign

facilities. *Our research independently corroborates the evidence of billing for therapeutic services that were never rendered and staffing.* We believe that all these practices result from the unique Management by Peer-Pressure model that Ensign runs, which we understand leads to ~60% annual Administrator turnover (including acquired facilities).

82. The MW Report further stated the following about what MW deemed the "License-Rental Scheme":

> *Ensign has been able to grow at 11 % per year via acquisition in part due to the use of unlicensed operators to manage skilled nursing facilities while paying licensed Administrators a monthly retainer of ~$2,000 plus $600 per site visit to hang their license on the wall.* We view this "license rental scheme" as a deliberate attempt to fool regulators into believing facilities are being operated by a licensed Administrator.
>
> *We believe this violates a material condition of Medicare and Medicaid participation under 42 CFR § 483. 70(d)(2) and reimbursements to these facilities could constitute "False Claims" under the False Claims Act under 31 U.S.C. § 3729.* We further believe the license-rental scheme is the foundation of Ensign's acquisition strategy. *Absent the scheme, Ensign's acquisition engine would likely slow from ~ 11 % annual growth to peer-level growth of ~2%, resulting in materially fewer acquisitions and significantly lower future EBIT growth.*

83. The MW Report then included the following graph outlining the




scheme:

84. The MW Report quoted a "Former Ensign Administrator" as saying the following about the scheme and how the person with the "rented" license conducts themselves whenever there is an investigation (alterations original to the MW Report):

> The first call that [the Ops Manager] is making is to [the person whose license is on the building] saying, 'Hey, state just showed up,' and that *person is dropping whatever he or she is doing and hightailing it to the building to say, 'Hey, I'm the Administrator here ... ' and they kind of put on a show of, 'I'm the Administrator of record here,' and usually the state doesn't dig into that too much."*

85. The MW Report stated the following under the heading "Unlicensed Administrators are not Speeding Ticket Violations":

> The potential for material, even crippling penalties against ENSG seem far greater than in prior well-known "regulatory shorts". *Each of a former DOJ prosecutor and former OIG special agent emphasized the gravity of this apparent conduct, emphasizing that as we presented it in a hypothetical fact pattern, the conduct likely amounts to fraud,*

> *particularly if there's evidence of concealment.* They emphasized that what we described were not minor paperwork violations; and, noted that enforcement *is more likely when the misconduct involves a vulnerable patient population and a licensing requirement intended to protect the health and safety of the population.*

86. The MW Report further quoted a "Former Assistant U.S. Attorney, Department of Justice" as saying the following about the scheme (alterations original to the MW Report): "Not only [would it be] a false certification, but [if] there's actually further attempts to hide this, which [would] really show[s] an intent to defraud rather than just mere negligence or oversight."

87. MW stated the following about the "four independent evidence sources" corroborating its allegation of Ensign conducting an illegal license rental scheme:

> We identified four independent evidence sources supporting the existence of an Administrator license rental structure across Ensign facilities: (i) a copy of the contract Ensign apparently uses to arrange Administrator license rentals while unlicensed operators run day-to-day facility operations, (ii) interviews with former Ensign employees across multiple states and roles, (iii) CMS survey reports documenting unlicensed operators running facilities, and (iv) unannounced private investigator site visits conducted across 15% of all Ensign facilities in eight states.
>
> *Taken together, we believe this evidence makes clear these practices are systematic and widespread, rather than isolated.*

88. The MW Report then included the following graph, including noting that a real, non-fraudulent administrator would make over $120,000 a year, rather than $24K for what MW deems a rental or fraudulent administrator:




89. On this news, Ensign stock fell $4.52 per share, or 2.98%, to close at $147.13 on June 11, 2026.

90. Then, on June 18, 2026, Hunterbrook issued a follow-up report entitled "New: Patients Hungry in Ensign Facilities".

91. The article stated that Ensign caregivers and residents had reached out to Hunterbrook since the publication of the Hunterbrook Report, to add "new, firsthand evidence of ***resident hunger, payroll falsification, understaffing, and staff licensing issues.***"

92. The article preliminarily stated that Ensign won't "respond to [Hunterbrook's] reporting." Further, Ensign "has not replied to repeated emails or phone calls. It didn't respond to Bloomberg News, either. And it did not engage when Hunterbrook sent a billboard truck to its headquarters, instead sending security after the driver."

93. The article stated that since the publication of the Hunterbrook Report, "staff who have worked at Ensign's facilities have flooded Hunterbrook's inbox with harrowing accounts of conditions inside those facilities. *The company, meanwhile, has expanded its stock repurchase authorization to $100 million.*"

94. The article even said the following about hunger at Ensign facilities:

One certified nursing assistant (CNA) claimed their facility- where they had worked for a decade - *was stripped of resources when Ensign took over. They even claimed it won a company award for cutting its food budget as residents went hungry.*

The alleged award isn't on display, the CNA said: “It's not something to be proud of.” *The kitchen is allegedly kept locked, so staff find ways to sneak in for food. The CNA said they once drove to a nearby Sonic, on their own time and their own dime, to buy a hungry resident a hamburger. The CNA makes $16.75 an hour.*

*That CNA wasn't alone.*

The accounts that reached Hunterbrook after our investigation into Ensign came from Texas, Arizona, California, and Tennessee. Most sources spoke on condition of anonymity, fearing retaliation. *Their stories corroborate our reporting and add firsthand detail of the often grim reality inside Ensign facilities.*

Asked what had changed the most since Ensign took over, the CNA from Tennessee answered: *“The dignity of our residents.”*

95. The article further stated the following under the headline “Weight Loss, Hunger”: The award, the locked kitchen, the Sonic run - and there was more.

The same CNA in Tennessee told Hunterbrook about the food residents do get served. *“They 're getting like half-cup-sized portions,” they said. “Like if you were on a weight loss diet.* “Federal law requires nursing facilities to provide each resident with a well-balanced diet that meets his or her specific dietary needs. *Yet research still finds malnutrition and food deprivation across the industry.*

A separate CNA at an Ensign facility in California recounted similar nutritional shortcomings. *Though some residents had conditions with*

*specific dietary needs, like diabetes or hypertension, they said, everyone was served the same thing.*

"I don't think it's adequate," the CNA told Hunterbrook about the food served to residents. "It's not healthy at all." *And because the floor is so short-staffed, the CNA said, residents with dementia who can't feed themselves are simply left unfed. "Then the patients end up losing weight, and they just go downhill."*

96. The article stated the following under the headline "Shortages and Locked Supply Closets", discussing how staff bought residents toiletries out of pocket to help them "preserve some basic dignity":

Hunger is one symptom of a broader refusal to spend on necessities.

*Three people who worked for Ensign described severe shortages of even the cheapest supplies. A former licensed practical nurse (LPN) wrote in about a constant lack of basic materials for patients who were often in "very acute" need, with "numerous wounds." In Tennessee, a CNA said it went beyond shortages: Essentials were rationed and locked in closets only management could open. Staff bought soap and deodorant out of their own pockets to preserve some basic dignity for residents.*

*In California, another CNA described the same locked closets.* "For the first year or more we didn't have access to bottles of soap," the CNA said. *"They're trying to save money or something." Staff, allegedly, weren't given the alcohol pads needed to clean catheter drainage tubes, the California CNA said - so "people just empty it ... and then just close it up again.* "*This could lead to urinary tract infections, according to the CNA.*

*"That could kill them."*

97. The article stated the following about "inflating nursing hours" by logging nonclinical workers as floor Certified Nursing Assistants, or "CNAs":

The shortages weren't the only thing being hidden.

*Independently of each other, both Tennessee employees described a scheme to make the facility look better staffed than it was: nonclinical workers logged as floor CNAs.*

*Hours for people employed in office, housekeeping, and dietary roles were recorded as CNA hours, an employee explained- inflating the facility's reported nursing time so that, in their words,* "they don't have to staff more CNAs for that shift." *The LPN flagged the same alleged practice - "the use of CNA credentials for staffing purposes while employees were primarily working in non-direct care roles."*

98. The article further stated: The CNA also described a repeated situation where their hours were misreported:

*inserting lunch breaks they never took, and inflating their hours, including one shift logged as 19 hours. "I know I didn't work 19 hours,"* they told Hunterbrook. They raised it with HR, which claimed it was a mistake. Within weeks, they said, another shift showed up documented as 19 hours.

99. The article stated the following about how misclassifying staff hours helps to inflate the ratings on Ensign facilities, while patients can't be helped to even go to the bathroom or take a shower because there isn't enough help:

Misclassifying staff hours to inflate the facility's reported nursing hours *would also inflate the facility's CMS 5-star ratings for staffing and overall- as Hunterbrook found was the case in our initial investigation.*

The Tennessee CNA described how this plays out in real life.

In keeping with Hunterbrook's finding that registered nurse hours fall

> after Ensign acquires a facility, *this CNA estimated the building now has a single RN for 67 patients.*
>
> Sometimes, they said, staff need help transferring a patient out of bed, but there are no extra hands.
>
> *"These people are wanting their showers. It's impossible." An LPN who worked at an Ensign facility in Texas said there often weren't even enough CNAs to take patients to the bathroom.*
>
> *"I care deeply about the residents and have watched conditions deteriorate despite raising concerns internally," they said in an email.*

100. The article stated the following under the heading "Practicing Above Their License":

> Understaffing doesn't just shortchange residents - it pushes the problem onto employees with the lowest certification levels and pay scale.
>
> *When the schedule comes up short, our investigation found, Ensign fills the gap not by hiring, but by leaning on overworked, under credentialed staff.* That leaves frontline workers an impossible choice: Jeopardize their license to keep residents safe, or stop at what they're legally allowed to do and watch patients go without care.
>
> *The Tennessee CNA described RN coverage simply vanishing from a shift: "If that person didn't have an RN title and wanted that shift, then they would probably just throw another LPN in down there," they said. "There just wouldn't be an RN on shift."* The LPN in Texas lived the consequences of this staffing model - left, as a new LPN, responsible for some of the sickest patients in the building without adequate support. "*I was too ignorant at the time to realize my license was in jeopardy the longer I worked at this facility,"* they told Hunterbrook in an email.

The California CNA recalled months when the floor had at most one RN - and the only RN providing hands-on care was the assistant director of nursing. Otherwise, LPNs staffed the floor alone. LPNs in California are not licensed to independently perform critical tasks such as ventilator management or administering IVs.

*It is the definition of a moral quandary* - *staff forced, shift after shift, to choose between their professional code and the residents in front of them* . Ensign has built a workforce of people who, in the Tennessee CNA's words, *"put 110% into their residents' care" while quietly absorbing the legal and ethical risk of a staffing model designed to spend as little as possible on care.*

*The Texas LPN told Hunterbrook that their experience at Ensign made them stop working at skilled nursing facilities altogether. "I loved my patients and wanted nothing but the best for them," they said in an email, "but it was so hard on the soul to see the neglect.'*

101. On this news, Ensign stock fell $2.19 per share, or 1.4%, to close at $153.65 per share on June 18, 2026.

102. As of June 23, 2026, Ensign has not published *any* public response, such as on its investor relations page, to Hunterbrook or Muddy Waters' varied and disturbing allegations. As such, Ensign has provided no competing inference indicating a lack of scienter.

103. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiff and other Class members have suffered significant losses and damages.

**f. Defendants' Misconduct Has and Continues to Harm the Company**

104. As a direct and proximate result of the Defendants' conduct, the Company has been harmed and will continue to be. The harm includes, but is not

limited to, the costs already incurred and to be incurred defending the Company in the Securities Class Action, as well as costs to be incurred in remediating deficiencies in the Company's internal controls.

105. The Defendants failed to oversee and manage the Company in accordance with their fiduciary duties and Company policies. Ensign's reputation and goodwill have also been damaged by the Defendants' misconduct.

**g. Ensign Issues False and Misleading Proxy Statements**

106. In addition to the false and misleading statements discussed above, the Director Defendants also caused the Company to issue false and misleading proxy statements during the Relevant Period, including the Schedule 14A Proxy Statement issued on April 2, 2026 (the "2026 Proxy"), that sought stockholder votes to, among other things, re-elect the Director Defendants to serve on the Board.

107. The Director Defendants drafted, approved, reviewed, and/or signed the 2026 Proxy before it was filed with the SEC and disseminated to Ensign's stockholders. The Director Defendants negligently issued materially misleading statements in the 2026 Proxy. These allegations are based solely on negligence; they are not based on any allegations of recklessness or knowing conduct by or on behalf of the Director Defendants and they do not allege or do not sound in fraud. Plaintiff specifically disclaims any allegations of reliance upon any allegation of, or reference or any allegation of fraud, scienter, or recklessness with regard to the 2026 Proxy allegations and related claims.

108. In support of re-electing themselves, Defendants highlighted their supposed oversight of the Company in the 2026 Proxy. The 2026 Proxy stated:

> **Board Oversight of Risk**
>
> Effective risk management is critical to our ability to dignify and transform post-acute care. Our Board of Directors exercises direct oversight of risks to the Company and other risk areas not delegated to

one of the Board Committees. Our Board of Directors looks to the expertise of its Board Committees to provide strategic oversight in their areas of focus. The Board Committees are charged with specific areas of risk oversight and regularly report back to the full Board.

And,

**Board's Role in Risk Oversight**

- Our Board actively oversees the Company's risk and enterprise-wide risk management process in a way that balances managing risks while enhancing the long-term value of the Company for the benefit of the stockholders.
- Our Board focuses on effective risk oversight to set the Company's tone and culture towards effective risk management by developing and establishing a mutual understanding with management of the Company's risk philosophy and overall appetite for risk.
- Our Board is actively involved with management assessment of existing risk management processes and how management identifies, assesses and manages the Company's most significant risk exposures. Our Board expects frequent updates from management about the Company's most significant risks so as to enable it to evaluate whether management is responding appropriately.
- Our Board is actively engaged in managing talent and long-term succession planning for executives.

109. The 2026 Proxy thus assured stockholders that the Director Defendants understood Company-wide risks, actively oversaw the Company's risks and

exposures, as well as steps taken to monitor and mitigate risk exposures. In reality, the Director Defendants were utterly failing in their oversight duties by allowing the Company to operate with inadequate internal controls which resulted in the failure to disclose or prevent the Defendants from causing the Company to make materially false and misleading statements concerning Ensign's business and financial performance.

110. As a result of these misleading statements, the Company's stockholders voted via an uninformed stockholder vote to re-elect the Director Defendants to the Board.

**h. The Board Breached its Fiduciary Duties**

111. As officers and/or directors of Ensign, the Defendants owed Ensign fiduciary duties of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage Ensign in a fair, just, honest and equitable manner. The conduct of the Director Defendants involves a knowing or reckless violation of their obligations as directors and officers of Ensign, the absence of good faith on their part, and a reckless disregard for their duties to the Company that Director Defendants were aware or should have been aware posed a risk of serious injury to the Company.

112. Defendants, because of their positions of control and authority as directors and/or officers of Ensign, were able to and did exercise control over the wrongful acts complained of herein. As officers and/or directors of a publicly-traded company, the Defendants had a duty to prevent the dissemination of inaccurate and untruthful information regarding Ensign's financial condition, performance, growth, operations, financial statements, business, management, earnings, internal controls, and business prospects, so as to ensure that the market price of the Company's common stock would be based upon truthful and accurate information.

113. To discharge their duties, the officers and directors of Ensign were

required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors and Ensign were required to, among other things:

A. Ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the Company's stockholders;

B. Conduct the affairs of the Company in a lawful, efficient, business-like manner to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

C. Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company;

D. Oversee public statements made by the Company's officers and employees as to the financial condition of the Company at any given time, including ensuring that any statements about the Company's financial results and prospects are accurate, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

E. Remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws;

F. Maintain and implement an adequate and functioning system of

internal controls to ensure that the Company complied with all applicable laws, rules, and regulations; and

G. Ensure that the Company is operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules and regulations.

114. The conduct of the Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of the Company, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its stockholders, which the Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

115. The Board's Audit Committee is tasked with overseeing Ensign's financial reporting system and assisting the Board with its oversight of the adequacy and effectiveness of Ensign's internal controls over financial reporting and its disclosure controls and procedures. Specifically, according to the Audit Committee's charter, and as described in the 2026 Proxy, the primary functions of the Audit Committee include:

- overseeing the Company's compliance programs and any legal or regulatory matters that may have a material impact on the Company's financial statements;
- overseeing portions of our code of ethics and business conduct that relate to the integrity of our financial reports;
- overseeing the functioning of our internal controls and overseeing and participating in the resolution of internal control issues, where identified;
- reviewing and approving our transactions with related persons;
- pre-approving audit and permissible non-audit services to be performed by our independent accountants, and the fees to be

paid in connection therewith;

- overseeing the engagement, replacement, compensation, qualifications, independence and performance of our independent auditors, and the conduct of the annual independent audit of our financial statements;
- overseeing procedures for the receipt, retention and treatment of complaints regarding accounting, internal accounting controls or auditing matters, and for the confidential, anonymous submission by our employees of concerns regarding questionable accounting or auditing matters;
- overseeing the conduct of our financial reporting process and the integrity of our financial statements and other financial information provided by us to the public or any governmental or regulatory body;
- setting the "tone at the top" and emphasizing the importance of an environment that supports integrity in the financial reporting process;
- overseeing processes for monitoring auditor independence;
- overseeing implementation of new accounting standards;
- communicating with the outside auditor on matters related to the conduct of the audit and on critical audit matters expected to be described in the auditor's report;
- reviewing and understanding non-GAAP measures, and related company policies and disclosure controls; and
- overseeing the Company's cybersecurity risk management program, policies, and procedures.

116. In violation of the Audit Committee Charter, and their general duties as

members of the Audit Committee, Defendants Shaw, Agwunobi and Abbott conducted little, if any, oversight of the Company's internal controls over financial reporting, resulting in materially false and misleading statements regarding the Company's business and consciously disregarded their duties to monitor such controls. The Audit Committee's complete failure to perform their duties in good faith resulted in misrepresentations to the public and the Company's stockholders.

117. In addition, as officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act, the Defendants had a duty not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, so that the market price of the Company's common stock would be based upon truthful and accurate information. Accordingly, the Defendants breached their fiduciary duties by knowingly or recklessly causing the Company to make false and misleading statements of material fact about the Company's maintaining adequate internal controls and compliance with applicable rules and regulations.

118. The Defendants' flagrant violations of their fiduciary duties and unwillingness to heed the requirements of their Audit Committee Charter have inflicted, and will continue to inflict, significant harm on Ensign.

## DERIVATIVE ALLEGATIONS

119. Plaintiff brings this action derivatively in the right and for the benefit of Ensign to redress injuries suffered by Ensign as a direct result of the Director Defendants' breaches of fiduciary duty. Ensign is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

120. Plaintiff will adequately and fairly represent the interests of Ensign in

enforcing and prosecuting the Company's rights.

121. Plaintiff was a stockholder of Ensign at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is currently an Ensign stockholder.

## DEMAND FUTILITY ALLEGATIONS

122. Plaintiff repeats, re-alleges, and incorporates by reference each and every allegation set forth as though fully set forth herein.

123. The Ensign Board currently has nine members: Defendants Port, Blouin, Smith, Shaw, Agwunobi, Parkinson, Abbott, Snapper and Uychiat Pison.

124. Plaintiff has not made any demand on Ensign's current Board to institute this action against the Director Defendants, as any pre-suit demand would be excused. The Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

125. The Director Defendants had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. In addition, the Director Defendants owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively), and to ensure that the Board's duties were being discharged in good faith and with the required diligence and due care.

126. The Director Defendants' making or authorization of the false and misleading statements discussed above caused the Company's stock to trade at artificially inflated prices and misrepresented the financial health of Ensign. The failure to timely correct such statements, failure to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively), and failure to take necessary

and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required due diligence, constitute breaches of fiduciary duties that have resulted in the Director Defendants facing a substantial likelihood of liability. The Director Defendants could not fairly and fully prosecute this action or any other action concerning the misconduct described above.

**Demand is Excused as to Defendant Port**

127. Defendant Port is the Company's CEO. According to the 2026 Proxy, Defendant Port received compensation of $13,804,700.00 in 2025. Defendant Port depends on Ensign for his income. In addition, Ensign stated in the Proxy Statement that Defendant Port is not independent.

128. Defendant Port served as a director of the Company during the Relevant Time Period. As a director, Defendant Port had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Port was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

129. Defendant Port failed to conduct oversight of the Company's internal controls over financial reporting and the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor Ensign's controls, Defendant Port failed to protect corporate assets.

130. Defendant Port was an active participant in the misconduct described above. Defendant Port signed the 2025 10-K, as well as the Forms 10-Q filed by the Company during the Relevant Time Period. Defendant Port made false and misleading statements concerning Ensign's business and financial performance.

131. In addition, Defendant Port is a named defendant in the Securities Class Action.

132. Defendant Port faces a substantial likelihood of liability for these breaches, making any demand on Defendant Port futile.

**Demand is Excused as to Defendant Blouin**

133. Defendant Blouin served as a director of the Company during the Relevant Time Period. As a director, Defendant Blouin had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Blouin was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

134. Defendant Blouin failed to conduct oversight of the Company's internal controls over financial reporting or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor Ensign's controls, Defendant Blouin failed to protect corporate assets.

135. According to the 2026 Proxy, Defendant Blouin received $411,674 in compensation in 2025 in connection with her role as a Company director. Accordingly, Defendant Blouin cannot reasonably and objectively consider a demand to sue the Board that controls her continued compensation.

136. Defendant Blouin was an active participant in the misconduct described above. Defendant Blouin signed the 2025 10-K. Defendant Blouin therefore faces a substantial likelihood of liability.

137. Defendant Blouin knowingly or recklessly disregarded failures in the Company's internal controls. Accordingly, Defendant Blouin breached the fiduciary duty of loyalty and good faith by participating in the misconduct described above. Defendant Blouin faces a substantial likelihood of liability for these breaches, making any demand on Defendant Blouin futile.

**Demand is Excused as to Defendant Smith**

138. Defendant Smith served as a director of the Company during the Relevant Time Period. As a director, Defendant Smith had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Smith was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

139. Defendant Smith failed to conduct oversight of the Company's internal controls over financial reporting or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor Ensign's controls, Defendant Smith failed to protect corporate assets.

140. According to the 2026 Proxy, Defendant Smith received $394,674 in compensation in 2025 in connection with his role as a Company director. Accordingly, Defendant Smith cannot reasonably and objectively consider a demand to sue the Board that controls his continued compensation.

141. Defendant Smith was an active participant in the misconduct described above. Defendant Smith signed the 2025 10-K. Defendant Smith therefore faces a substantial likelihood of liability.

142. Defendant Smith knowingly or recklessly disregarded failures in the Company's internal controls. Accordingly, Defendant Smith breached the fiduciary duty of loyalty and good faith by participating in the misconduct described above. Defendant Smith faces a substantial likelihood of liability for these breaches, making any demand on Defendant Smith futile.

**Demand is Excused as to Defendant Shaw**

143. Defendant Shaw served as a director of the Company during the Relevant Time Period. As a director, Defendant Shaw had a duty to ensure that the Company's SEC filings, press releases, and other public statements and

presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Shaw was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

144. Defendant Shaw failed to conduct oversight of the Company's internal controls over financial reporting or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor Ensign's controls, Defendant Shaw failed to protect corporate assets.

145. According to the 2026 Proxy, Defendant Shaw received $412,674 in compensation in 2025 in connection with his role as a Company director. Accordingly, Defendant Shaw cannot reasonably and objectively consider a demand to sue the Board that controls his continued compensation.

146. Defendant Shaw was an active participant in the misconduct described above. Defendant Shaw signed the 2025 10-K. Defendant Shaw therefore faces a substantial likelihood of liability.

147. Defendant Shaw served on the Audit Committee during the Relevant Time Period. The Audit Committee is responsible for risk oversight and controls in financial reporting. The Audit Committee was thus responsible for reviewing and approving Ensign's Forms 10-Q and 10-K filed during the Relevant Time Period. Defendant Shaw was thus responsible for knowingly or recklessly allowing the improper statements related to the Company's business and financial performance.

148. Defendant Shaw knowingly or recklessly disregarded failures in the Company's internal controls. Accordingly, Defendant Shaw breached the fiduciary duty of loyalty and good faith by participating in the misconduct described above. Defendant Shaw faces a substantial likelihood of liability for these breaches, making any demand on Defendant Shaw futile.

**Demand is Excused as to Defendant Agwunobi**

149. Defendant Agwunobi served as a director of the Company during the Relevant Time Period. As a director, Defendant Agwunobi had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Agwunobi was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

150. Defendant Agwunobi failed to conduct oversight of the Company's internal controls over financial reporting or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor Ensign's controls, Defendant Agwunobi failed to protect corporate assets.

151. According to the 2026 Proxy, Defendant Agwunobi received $395,674 in compensation in 2025 in connection with his role as a Company director. Accordingly, Defendant Agwunobi cannot reasonably and objectively consider a demand to sue the Board that controls his continued compensation.

152. Defendant Agwunobi was an active participant in the misconduct described above. Defendant Agwunobi signed the 2025 10-K. Defendant Agwunobi therefore faces a substantial likelihood of liability.

153. Defendant Agwunobi served on the Audit Committee during the Relevant Time Period. The Audit Committee is responsible for risk oversight and controls in financial reporting. The Audit Committee was thus responsible for reviewing and approving Ensign's Forms 10-Q and 10-K filed during the Relevant Time Period. Defendant Agwunobi was thus responsible for knowingly or recklessly allowing the improper statements related to the Company's business and financial performance.

154. Defendant Agwunobi knowingly or recklessly disregarded failures in the Company's internal controls. Accordingly, Defendant Agwunobi breached the

fiduciary duty of loyalty and good faith by participating in the misconduct described above. Defendant Agwunobi faces a substantial likelihood of liability for these breaches, making any demand on Defendant Agwunobi futile.

**Demand is Excused as to Defendant Parkinson**

155. Defendant Parkinson served as a director of the Company during the Relevant Time Period. As a director, Defendant Parkinson had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Parkinson was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

156. Defendant Parkinson failed to conduct oversight of the Company's internal controls over financial reporting or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor Ensign's controls, Defendant Parkinson failed to protect corporate assets.

157. According to the 2026 Proxy, Defendant Parkinson received $387,674 in compensation in 2025 in connection with his role as a Company director. Accordingly, Defendant Parkinson cannot reasonably and objectively consider a demand to sue the Board that controls his continued compensation.

158. Defendant Parkinson was an active participant in the misconduct described above. Defendant Parkinson signed the 2025 10-K. Defendant Parkinson therefore faces a substantial likelihood of liability.

159. Defendant Parkinson knowingly or recklessly disregarded failures in the Company's internal controls. Accordingly, Defendant Parkinson breached the fiduciary duty of loyalty and good faith by participating in the misconduct described above. Defendant Parkinson faces a substantial likelihood of liability for these breaches, making any demand on Defendant Parkinson futile.

**Demand is Excused as to Defendant Abbott**

160. Defendant Abbott served as a director of the Company during the Relevant Time Period. As a director, Defendant Abbott had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Abbott was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

161. Defendant Abbott failed to conduct oversight of the Company's internal controls over financial reporting or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor Ensign's controls, Defendant Abbott failed to protect corporate assets.

162. According to the 2026 Proxy, Defendant Abbott received $406,674 in compensation in 2025 in connection with her role as a Company director. Accordingly, Defendant Abbott cannot reasonably and objectively consider a demand to sue the Board that controls her continued compensation.

163. Defendant Abbott was an active participant in the misconduct described above. Defendant Abbott signed the 2025 10-K. Defendant Abbott therefore faces a substantial likelihood of liability.

164. Defendant Abbott served on the Audit Committee during the Relevant Time Period. The Audit Committee is responsible for risk oversight and controls in financial reporting. The Audit Committee was thus responsible for reviewing and approving Ensign's Forms 10-Q and 10-K filed during the Relevant Time Period. Defendant Abbott was thus responsible for knowingly or recklessly allowing the improper statements related to the Company's business and financial performance.

165. Defendant Abbott knowingly or recklessly disregarded failures in the Company's internal controls. Accordingly, Defendant Abbott breached the fiduciary

duty of loyalty and good faith by participating in the misconduct described above. Defendant Abbott faces a substantial likelihood of liability for these breaches, making any demand on Defendant Abbott futile.

**Demand is Excused as to Defendant Snapper**

166. Defendant Snapper served as a director of the Company during the Relevant Time Period. As a director, Defendant Snapper had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Snapper was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

167. Defendant Snapper failed to conduct oversight of the Company's internal controls over financial reporting or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor Ensign's controls, Defendant Snapper failed to protect corporate assets.

168. According to the 2026 Proxy Statement, Defendant Snapper received $11,891,115 in compensation in connection with her role as an executive officer of Company. Defendant Snapper is not otherwise employed. Accordingly, Defendant Snapper cannot reasonably and objectively consider a demand to sue the Board that controls her continued compensation.

169. Defendant Snapper was an active participant in the misconduct described above. Defendant Snapper signed the 2025 10-K. Defendant Snapper therefore faces a substantial likelihood of liability.

170. Defendant Snapper knowingly or recklessly disregarded failures in the Company's internal controls. Accordingly, Defendant Snapper breached the fiduciary duty of loyalty and good faith by participating in the misconduct described above. Defendant Snapper faces a substantial likelihood of liability for these

breaches, making any demand on Defendant Snapper futile.

**Demand is Excused as to Defendant Uychiat Pison**

171. Defendant Pison served as a director of the Company during the Relevant Time Period. As a director, Defendant Pison had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Pison was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

172. Defendant Pison failed to conduct oversight of the Company's internal controls over financial reporting or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor Ensign's controls, Defendant Pison failed to protect corporate assets.

173. Defendant Pison has served as Vice President of Clinical Services at Ensign since 2016. According to the 2026 Proxy, Defendant Pison received no additional compensation in connection with her role as a Company director. Defendant Pison is not otherwise employed. Accordingly, Defendant Pison cannot reasonably and objectively consider a demand to sue the Board.

174. Defendant Pison was an active participant in the misconduct described above. Defendant Pison signed the 2025 10-K. Defendant Pison therefore faces a substantial likelihood of liability.

175. Defendant Pison knowingly or recklessly disregarded failures in the Company's internal controls. Accordingly, Defendant Pison breached the fiduciary duty of loyalty and good faith by participating in the misconduct described above. Defendant Pison faces a substantial likelihood of liability for these breaches, making any demand on Defendant Pison futile.

176. Based on the facts alleged herein, there is a substantial likelihood that

Plaintiff will be able to prove that these individuals breached their fiduciary duties by condoning the misconduct and failing to take meaningful action to remedy the resultant harm.

## CLAIMS FOR RELIEF

### COUNT I
### Breach of Fiduciary Duty
### (Derivatively Against The Director Defendants)

177. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

178. Each of the Director Defendants owed and owes Ensign the highest obligations of loyalty, good faith, due care, and oversight.

179. Each of the Director Defendants violated and breached their fiduciary duties of loyalty, good faith, candor and oversight to the Company.

180. The Director Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company. In breach of their fiduciary duties, the Director Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

181. In addition, the Director Defendants further breached their fiduciary duties owed to Ensign by willfully or recklessly making and/or causing the Company to make false and misleading statements and omissions of material fact and allowing the Company to operate with inadequate internal controls which resulted in the misrepresentations and failure to disclose that Ensign: (a) neglects elderly patients to generate profits; (b) regularly engages in illegal activities such as upcoding; (c) defrauds the federal government by, among other means, taking funds to care for especially unwell patients, but then not caring for those same patients; and (d) takes

measures to conceal the foregoing that include manipulating ratings on its facilities.

182. The Director Defendants failed to correct and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact, exposing them to personal liability to the Company for breaching their fiduciary duties.

183. The Director Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the wrongdoing set forth herein and to fail to maintain adequate internal controls. The Director Defendants had actual knowledge that the Company was engaging in the wrongdoing set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the wrongdoing and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Director Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

184. As a direct and proximate result of the breaches of duty alleged herein, Ensign has sustained and will sustain significant damages.

185. As a result of the misconduct alleged herein, these Defendants are liable to the Company.

186. Plaintiff, on behalf of Ensign, has no adequate remedy at law.

## COUNT II
## Breach of Fiduciary Duty
## (Derivatively Against the Officer Defendants)

187. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

188. The Officer Defendants are executive officers of the Company. As executive officers, the Officer Defendants owed and owe Ensign the highest obligations of loyalty, good faith, due care, oversight, and candor.

189. The Officer Defendants breached their fiduciary duties owed to Ensign by willfully or recklessly making and/or causing the Company to make false and misleading statements and omissions of material fact, failing to disclose that Ensign: (a) neglects elderly patients to generate profits; (b) regularly engages in illegal activities such as upcoding; (c) defrauds the federal government by, among other means, taking funds to care for especially unwell patients, but then not caring for those same patients; and (d) takes measures to conceal the foregoing that include manipulating ratings on its facilities.

190. The Officer Defendants failed to correct and cause the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact.

191. As a direct and proximate result of the breaches of duty alleged herein, Ensign has sustained and will sustain significant damages.

192. As a result of the misconduct alleged herein, the Officer Defendants are liable to the Company.

193. Plaintiff, on behalf of Ensign, has no adequate remedy at law.

## COUNT III
## Gross Mismanagement
## (Against All Defendants)

194. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

195. By their actions alleged herein, the Defendants abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the

operations of a publicly held corporation.

196. As a direct and proximate result of the Defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained significant damages.

197. As a result of the misconduct alleged herein, the Defendants are liable to the Company.

198. Plaintiff, on behalf of Ensign, has no adequate remedy at law.

**COUNT IV**
**Waste of Corporate Assets**
**(Derivatively Against All Defendants)**

199. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

200. The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Time Period. It resulted in continuous, connected, and ongoing harm to the Company.

201. As a result of the misconduct described above, the Defendants wasted corporate assets by, *inter alia*: (i) paying excessive compensation and bonuses to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend Defendants' unlawful actions.

202. As a direct and proximate result of the waste of corporate assets and breaches of duty alleged herein, Ensign has sustained significant damages.

203. As a result of the misconduct alleged herein, the Defendants are liable to the Company.

204. Plaintiff, on behalf of Ensign, has no adequate remedy at law.

**COUNT V**
**Unjust Enrichment**
**(Derivatively Against the Officer Defendants)**

205. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

206. By their wrongful acts, violations of law, and false or misleading statements or omissions of material fact that they caused to be made, the Officer Defendants were unjustly enriched at the expense of, and the detriment of, the Company.

207. The Officer Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from the Company that was tied to the performance of the Company or its stock price or received compensation or other payments that were unjust in light of the Officer Defendants' bad faith conduct.

208. Plaintiff, on behalf of Ensign, seeks restitution from the Officer Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Defendants due to their wrongful conduct and breach of their fiduciary duties.

**COUNT VI**
**Violation of Section 14(a) of the Exchange Act**
**(Against The Director Defendants)**

209. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

210. The section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Director Defendants. The section 14(a) Exchange Act claims

detailed herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegation of reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the nonfraud claims.

211. The Director Defendants negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to stockholders which were contained in the 2026 Proxy Statement. In the 2026 Proxy Statement, the Board solicited stockholder votes to reelect the Director Defendants to the Board.

212. The Proxy Statement, however, misrepresented and failed to disclose the Board's risk oversight and the Company's inadequate internal controls, which facilitated the illegal behavior described herein. By reasons of the conduct alleged herein, the Director Defendants violated section 14(a) of the Exchange Act. As a direct and proximate result of these defendants' wrongful conduct, Ensign misled and deceived its stockholders by making materially misleading statements that were essential links in stockholders following the Company's recommendation and voting to reelect the Director Defendants.

213. Plaintiff, on behalf of Ensign, thereby seeks relief for damages inflicted upon the Company based upon the misleading Proxy Statement in connection with the improper reelection of the Director Defendants to the Board.

## RELIEF REQUESTED

WHEREFORE, Plaintiff demands judgment as follows:

A. Declaring that Plaintiff may maintain this derivative action on behalf of Ensign and that Plaintiff is a proper and adequate representative of the Company;

B. Against all of the Defendants and in favor of Ensign for the amount of damages sustained by the Company as a result of the acts and transactions complained of herein;

C. Granting appropriate equitable relief to remedy the Defendants' breaches of fiduciary duties, including, but not limited to the institution of appropriate corporate governance measures;

D. Awarding Ensign restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by Defendants;

E. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

F. Granting such other and further equitable relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

Dated: November 18, 2026 **LAW OFFICE OF FRANCIS J. FLYNN, JR.**

By: /s/ Francis J. Flynn, Jr. #304712
Francis J. "Casey" Flynn, Jr., #304712
6057 Metropolitan Plz.
Los Angeles, CA 90036
Tel: (314) 622-2836
casey@lawofficeflynn.com

**BRIAN MURRAY LAW PLLC**
Brian P. Murray, to seek admission Pro Hac Vice
750 E. Main St., Suite 620
Stamford, CT 06902
Phone: (203) 246-2368
Email: bmurray@brianmurraylaw.com

**ROWLEY LAW PLLC**
Shane T. Rowley, to seek admission Pro Hac Vice

Danielle Rowland Lindahl, to seek admission
Pro Hac Vice
50 Main Street, Suite 1000
White Plains, New York 10606
Phone: (914) 400-1920
Fax: (914) 301-3514
Email: srowley@rowleylawpllc.com
drl@rowleylawpllc.com

*Counsel for Plaintiff*